## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

| | | |
|---|---|---|
| ALFREDO GONZALEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| REYNALDO GUEVARA, JOANN | ) | |
| HALVORSEN as PERSONAL | ) | |
| REPRESENTATIVE of the ESTATE OF | ) | |
| ERNEST HALVORSEN, EDWARD | ) | |
| MINGEY, STEVEN GAWRYS, LEE | ) | |
| EPPLEN, FERNANDO MONTILLA, | ) | |
| ROLAND PAULNITSKY, RICHARD | ) | |
| SCHAK, ROBERT SMITKA, | ) | |
| JENNIFER BOROWITZ, FRANK | ) | |
| DiFRANCO, JOHN PERKAUS, the | ) | |
| CITY OF CHICAGO, and COOK | ) | |
| COUNTY, | ) | |
| | | |
| Defendants. | | |

## <u>COMPLAINT</u>

Plaintiff, ALFREDO GONZALEZ, by his undersigned attorney, for his

complaint against REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD

MINGEY, STEVEN GAWRYS, LEE EPPLEN, FERNANDO MONTILLA, ROLAND

PAULNITSKY, RICHARD SCHAK, ROBERT SMITKA, JENNIFER BOROWITZ,

FRANK DiFRANCO, JOHN PERKAUS, the CITY OF CHICAGO, and COOK

COUNTY.

## INTRODUCTION

1.      Plaintiff, Alfredo Gonzalez spent almost 32 years incarcerated in the Illinois Department of Corrections for the murders of Torrence and Kevin Wiley ("the Wiley Murders") – a crime he did not commit.

2.      In or around August 22, 1990, notorious Chicago Police Detectives Reynaldo Guevara and Ernest Halverson, in concert with the other named Defendants, fabricated and suppressed evidence to frame Plaintiff for a crime he did not commit, while indifferent to the fact that he was innocent.

3.      Plaintiff's arrest, indictment, prosecution, and conviction were based entirely on the false evidence Defendants manufactured against him.

4.      In addition, Defendants coerced confessions and statements from other witnesses, who falsely implicated Plaintiff in the crime.

5.      One of those false statements was from Jose Maysonet ("Maysonet").

6.      Maysonet and Defendant Guevara operated a drug selling enterprise over the course of several months just prior to Maysonet giving a statement implicating Plaintiff in the Wiley Murders. That relationship soured, and so Defendant Guevara physically and psychologically abused Maysonet until he implicated himself, Plaintiff, and others.

7.      At no point did Defendants disclose these facts about Maysonet to state prosecutors, Plaintiff, or his criminal defense counsel.

8.      To wrongly convict Plaintiff, Defendants also relied on an involuntary and false confession they extracted from Plaintiff after a physically and

psychologically abusive interrogation, during which they beat Plaintiff and repeatedly threatened to harm his partner, children, and sister.

9.      There were no eyewitnesses to the Wiley Murders, no plausible motive, and no physical evidence connecting Plaintiff to the crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion to obtain Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

10.     Plaintiff is one of at least 36 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

11.     The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

12.     Cook County courts have found that Defendant Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

13.     In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendant Guevara has specifically pleaded his Fifth Amendment right not to incriminate

himself on multiple occasions in response to questions about his misconduct during the investigation of the Wiley Murders.

14.     On August 9, 2022, the state vacated Plaintiff's conviction and moved for an order to *nolle prosequi* the charges against Plaintiff – along with seven other victims of Defendant Guevara from other cases – in an unprecedented mass exoneration.

15.     That same day, Plaintiff was released from custody after having spent nearly 32 years of his life locked behind bars.

16.     Plaintiff was a son, a brother, a domestic partner, and a father to three young children when he was targeted and torn from his family, framed for a crime he did not commit by Defendants.

17.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the incalculable loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

19.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

21.     Plaintiff Alfredo Gonzalez spent 32 years in prison for a crime he did not commit.

22.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Steven Gawrys, Lee Epplen, Fernando Montilla, Roland Paulnitsky, Richard Schak, Robert Smitka, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

23.     Defendants Guevara, Halvorsen, Mingey, Gawrys, Epplen, Montilla, Paulnitsky, Schak, and Smitka are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

24.     JoAnn Halvorsen, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

25.     At all times relevant to the events described in this complaint, Defendants Edward Mingey and Lee Epplen, and other unknown law enforcement

officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

26.     At all relevant times, Defendants Jennifer Borowitz, Frank DiFranco, and John Perkaus were Assistant Cook County State's Attorneys. Defendants Borowitz, DiFranco, and Perkaus conspired with the Police Officer Defendants, prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in investigatory capacities, to manufacture and fabricate coerced confessions and statements from Plaintiff and other witnesses, conceal evidence, and maliciously prosecute Plaintiff for the Wiley Murders. Defendants Borowitz, DiFranco, and Perkaus are referred to collectively as the "Prosecutor Defendants" throughout this Complaint.

27.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted during their investigation of the Wiley Murders as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

28.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was

at all relevant times the employer of the Prosecutor Defendants. Defendant Cook County is a necessary party to this lawsuit.

29.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crimes

30.     Early in the morning of May 25, 1990 at approximately 1:00 a.m., Torrence and Kevin Wiley, two Black men in their late 20s, were shot and killed in front of a vacant lot located at 3428 W. North Avenue.

31.     The brothers were not associated with any street gangs or drug activity and did not live in Humboldt Park.

32.     There were no eyewitnesses to the crime, but two women who lived on the block told the police that they heard an argument just before the shooting.

33.     These women told police they heard an argument between Black men, not men speaking Spanish or speaking English with Spanish accents.

34.     The women heard only small portions of the argument including the statements, "I'm trying to help you," and "I'm going to kill you first" and "you said we would get the last bus." Of particular note, the men kept saying the name "Lulu Dog."

35.     The victims' sister provided a phone number and address for Lulu Dog.

36. Plaintiff is not, and has never gone by, Lulu Dog. He has no connection or relationship to anyone named Lulu Dog.

37. Other than that, the initial canvas of the neighborhood yielded little information.

**Defendants Initially Target Two Other Men**

38. The Wiley Murders investigation had gone cold when Defendants Guevara and Halvorsen were brought in.

39. Defendants Guevara and Halvorsen had a reputation of being able to solve dead-end cases with little to no evidence.

40. In this case, Defendants Guevara and Halvorsen, along with the other Defendants, decided to frame members of the Latin Kings for the Wiley Murders.

41. Their first target was Efrain Cruz ("Cruz") and Francisco Veras ("Veras"), two members of the Latin Kings that Guevara and Halvorsen arrested off the street and took to the Area Five police station ("Area Five").

42. Cruz was specifically targeted by Defendants because he had recently beaten an armed robbery case.

43. It was commonly known in the community that in circumstances where individuals would "beat" a case in court, Area Five detectives would target those same individuals for a future "frame-up."

44. Defendants interrogated Cruz and Veras separately, showed them photographs of the Wiley brothers' dead bodies, and eventually put each man in a lineup and told each that they were identified by a witness as the murderer.

45.     Defendants also questioned Cruz and Veras about someone named Jeffrey "Black Jeff" Watts who Defendants claimed was the getaway driver and explained that the first person to finger the other as the shooter would get leniency.

46.     Cruz and Veras told Defendants that they were innocent and eventually realized that they had been in police custody at the time of the Wiley Murders.

47.     Defendants concealed evidence of their failed attempt to initially frame Cruz and Veras, omitting it from the police files related to Wiley Murders investigation.

48.     They either never documented the Cruz and Veras arrests, interrogations, and lineups, or they destroyed such records.

49.     At no point did the Police Officer Defendants disclose any of this information to Plaintiff or his counsel.

### Jose "Juan" Maysonet Becomes the Target Based on His Involvement in a Criminal Drug Enterprise with Defendant Guevara and Joseph Miedzianowski

50.     Defendants then shifted their focus to Jose Maysonet, another Latin King, to close the case.

51.     Unbeknownst to Plaintiff, Maysonet, who Plaintiff knew only as "Juan," had struck a deal with Defendant Guevara and another infamous Chicago police officer, Joseph Miedzianowski ("Miedzianowski").

52.     Maysonet had agreed to pay Defendant Guevara and Miedzianowski protection money so Maysonet could sell drugs without police interference.

53.     Miedzianowksi was charged and convicted federally for his role in leading a massive drug enterprise while serving as a Chicago police officer. Miedzianowski is currently serving a life sentence in federal prison without parole.

54.     In addition to their criminal relationship, Maysonet and Defendant Guevara had an ongoing personal relationship in which Defendant Guevara would socialize with Maysonet and spend time at his home.

55.     Plaintiff knew nothing about Maysonet's relationship with Defendant Guevara or Miedzianowksi.

56.     Shortly before Plaintiff was arrested, Maysonet and Defendant Guevara had a falling out in which Maysonet told Defendant Guevara he would no longer pay him for police protection of his illegal narcotic sales.

57.     As a result, Defendant Guevara used the Wiley Murders as an opportunity to eliminate any personal risk he had from his drug dealing protection racket with Maysonet.

58.     On August 22, 1990, Defendant Paulnitsky falsely arrested Maysonet.

59.     Maysonet did not speak or read English at the time.

60.     Defendants Paulnitsky and Montilla interrogated Maysonet. During that interrogation, Paulnitsky physically abused Maysonet.

61.     Despite the abuse, Maysonet denied any knowledge of the murders.

62.     Defendants Guevara and Halvorsen then took their turn and interrogated Maysonet.

63.     Defendant Guevara repeatedly physically abused Maysonet over the course of many hours.

64.     Defendants also threatened Maysonet by telling him that he would never see his family again if he did not falsely admit to his involvement in the crimes.

65.     Maysonet continued to deny any knowledge of the murders.

66.     Defendants also brought Maysonet's pregnant girlfriend, Rosa Bello ("Bello"), into Area Five. Defendants interrogated Bello and threatened her that she would lose her children – including her and Maysonet's unborn child – if she refused to cooperate.

67.     In addition to repeatedly physically abusing Maysonet, Defendant Guevara threatened Maysonet by telling him that he would get the death penalty if he did not admit his involvement in the murders and by continually threatening to "lock up" Maysonet's girlfriend and sister.

68.     Defendant Guevara told Maysonet that he would take it easier on him if Maysonet would falsely implicate other people to shoulder the blame for the murders.

69.     Defendant Borowitz came into the interrogation room at some point and questioned Maysonet about the Wiley Murders.

70.     Maysonet tried to tell Defendant Borowitz he was innocent, and that Defendant Guevara had beaten him, and he also asked for an attorney. Because Maysonet only spoke Spanish, Defendant Montilla served as the interpreter for

these requests. Defendant Borowitz told him that if he did not cooperate, he would have to further deal with Defendant Guevara. Defendant Borowitz then left.

71.     Defendant Guevara continued to physically abuse and threaten Maysonet.

72.     Finally, after approximately 20 hours of physical and psychological abuse, Maysonet's will was overborne, and he relented and agreed to say what Defendants had been repeatedly urging him to say.

73.     Defendant Guevara told Maysonet he needed him to provide Defendant Guevara with names of additional people to involve in the murder.

74.     Eventually, at Defendant Guevara's urging, Maysonet provided Plaintiff's nickname, "Lluvia," and the nicknames of two other men, "Tino" and "Fro."

75.     Maysonet then gave a court reported statement to Defendant DiFranco repeating what Defendant Guevara told him to say, with Defendant Montilla acting as an interpreter. Based on the threats and abuse, Maysonet falsely implicated Plaintiff as the shooter in the Wiley Murders.

76.     The Prosecutor Defendants were present at the Area Five Detective Division while Maysonet's interrogation was ongoing. The Prosecutor Defendants also participated personally in the interrogation and drafting of Maysonet's false statement incriminating Plaintiff, which Maysonet was forced to sign.

## Plaintiff Becomes the Target

77.     Relying on the statement that Defendants coerced from Maysonet, Defendants arrested Plaintiff.

78.     Defendant Guevara struck Plaintiff in the back of his head the moment he saw him.

79.     Defendants Guevara and Halvorsen took Plaintiff back to Area Five and placed him in an interrogation room.

80.     Once inside the room, Defendant Halvorsen exited and Defendant Guevara immediately grabbed Plaintiff by the throat, pushed him against a wall, and accused him of a double murder.

81.     Defendant Guevara then handcuffed Plaintiff to the wall and then repeatedly struck Plaintiff in the face.

82.     Plaintiff tried to tell Defendant Guevara he had not done anything and begged Defendant Guevara to let him call his attorney.

83.     Defendant Guevara told Plaintiff he would not let him speak to his attorney.

84.     Defendant Halvorsen told Plaintiff that Defendant Guevara would never let him leave without admitting that he committed the murders.

85.     Plaintiff still did not know what murders the Defendants were accusing him of.

86.     Defendants Guevara and Halvorsen left Plaintiff alone in the room for an extended period of time. Every time Plaintiff attempted to rest, other Defendants entered the room and woke him up.

87.     Compounding the physically and psychologically abusive tactics, the Police Officer Defendants intentionally deprived Plaintiff of sleep throughout the interrogation. Plaintiff went to the police station around 1:30 am. The Police Officer Defendants kept Plaintiff in a windowless interview room with the lights on almost the entire time his interrogation proceeded.

88.     In addition to the Police Officer Defendants keeping him in an interrogation room with nothing but a desk and a chair, with the lights on, Plaintiff was handcuffed to the wall so he could not lie down. By the time Plaintiff's interrogation came to an end, approximately two days after he was initially picked up, Plaintiff had not slept more than a few hours since waking up on the morning of August 22. The sleep deprivation heightened the already impermissibly coercive nature of the interrogation.

89.     The rooms in which the interrogation took place were closed and locked and before Plaintiff was physically beaten, the glass window in the door to the interrogation room was covered up with paper so that Plaintiff could not see out and others could not see in.

90.     At one point, Defendant Guevara returned to the room Plaintiff was in and told him that Jose Maysonet and Rosa Bello had implicated him in the

murders. Plaintiff did not know who Defendant Guevara was referring to and told him he wanted to speak to an attorney.

91.     Defendant Guevara then violently hit Plaintiff in the face.

92.     Guevara's use of physical abuse, threats, and other coercive tactics continued for many more hours.

93.     Among other things, Guevara also choked Plaintiff and punched him in the groin.

94.     At various points throughout the interrogation, Plaintiff begged for an attorney and Defendant Guevara reiterated that he would not let him see an attorney. Plaintiff also invoked his right to an attorney at other times, but Guevara never ceased his questioning.

95.     Defendant Guevara also told Plaintiff that there were additional witnesses implicating him in the murders including Plaintiff's nephew, Justino Cruz and someone Defendant Guevara referred to as "Fro."

96.     Defendant Guevara told Plaintiff he needed to sign a statement confessing to the murders if he ever wanted to see his children again.

97.     When Defendant Guevara would leave the room, other Police Officer Defendants entered and encouraged Plaintiff to say what Defendant Guevara was instructing him to say.

98.     At one point, Defendant Guevara returned and told Plaintiff he was taking him to the scene of the crime.

99.     Defendant Guevara and Defendant Borowitz then took Plaintiff out of Area Five to the location on North Avenue where the Wiley brothers had been shot and killed.

100.    Defendant Guevara attempted to get Plaintiff to demonstrate where the shooting occurred, but since Plaintiff was innocent and had no idea where the crimes had taken place, Plaintiff was unable to do so.

101.    Defendant Guevara became very angry with Plaintiff.

102.    Defendant Borowitz instructed Defendant Guevara to stop the demonstration with Plaintiff.

103.    Defendants Guevara and Borowitz took Plaintiff back to Area Five.

104.    Upon return to Area Five, Defendant Guevara took Plaintiff into an interrogation room and resumed physically beating Plaintiff, again punching him in the groin multiple times.

105.    Defendant Guevara also showed Plaintiff photographs of the deceased Wiley brothers from the crime scene.

106.    At one point, after Defendant Guevara exited the room, Defendant Halvorsen came in and stomped on Plaintiff's foot, grabbed him by the neck, and slapped him in the face several times. Defendant Halvorsen reiterated to Plaintiff that he needed to do what Defendant Guevara was telling him to do.

107.    During the course of these violent and coercive interrogations, Defendants took Plaintiff into another room and subjected him to two separate purported lineups.

108. After the second lineup, Defendant Guevara told him he had been identified by a witness as the man who shot the Wiley brothers.

109. Plaintiff became overwhelmed with fear and hopelessness and began to weep uncontrollably. Defendant Guevara ridiculed Plaintiff and called him names.

110. After yet further physical abuse and threats by Guevara, and further proclamations of innocence by Plaintiff, Guevara told Plaintiff he was going to interrogate his sister and the mother of his children.

111. In fear for his life and for that of his family, Plaintiff could no longer take the physical and psychological abuse and he agreed do what Defendant Guevara wanted him to.

112. By that point, after approximately 48 hours of brutal, violent and psychologically abusive interrogation, Plaintiff's will was completely overborne.

## Plaintiff's False Confession

113. Defendant Guevara then coached Plaintiff on details of the crime and how to give a statement to the Prosecutor Defendants.

114. Defendant Guevara instructed Plaintiff to tell the Prosecutor Defendants that he, Jose Maysonet, Justino Cruz, and a person he knew as "Fro," had all been involved in the Wiley Murders and that Plaintiff was specifically the shooter.

115. Eventually, Defendant Borowitz entered the room to take Plaintiff's statement.

116.    Instead of doing exactly as Defendant Guevara had instructed him, Plaintiff told Defendant Borowitz an altered version of what Defendant Guevara had coached him to say.

117.    Because he was in fact completely innocent, Plaintiff could not bring himself to give a statement stating that he was the man who shot and killed the Wiley brothers, so he instead told Defendant Borowitz that Jose Maysonet was the shooter.

118.    At the time, Plaintiff only knew Maysonet by the name of "Juan" and did not know who Guevara was referring to when he used the name "Jose Maysonet" or "Maysonet." Because Defendant Guevara had repeatedly told Plaintiff that "Maysonet" had implicated him, Plaintiff decided to turn the blame back onto Maysonet.

119.    This enraged Defendant Guevara, but Defendant Borowitz instructed Plaintiff to continue giving the statement.

120.    After the statement had ended and as Plaintiff was being led out of the interrogation room, he turned to Defendant Borowitz and whispered to her "I am innocent." Defendant Borowitz did not respond.

121.    The Prosecutor Defendants were present while Plaintiff's interrogation was ongoing and participated personally in the interrogation and fabricating the false incriminating statement that Plaintiff was forced to sign.

122.    Plaintiff's statement was entirely false. It was the product of physical and psychological coercion and manufactured by Defendants.

123. It was ultimately used to prosecute and convict Plaintiff of a crime he did not commit.

124. In fact, Plaintiff could not have committed the crime. On the night the Wiley brothers were shot and killed, Plaintiff was mourning the death of a loved one. Earlier that day, he had gone to a wake, and then to the funeral early the next morning.

### Justino Cruz is Physically Abused and Psychologically Coerced Until He Signs a False Statement

125. At some point, Defendants arrested Justino Cruz and accused him of killing the Wiley brothers.

126. Cruz told Defendants he was innocent and that he did not know what they were talking about.

127. Defendants, including Defendants Guevara, Schak, Smitka, and others interrogated Cruz and told him that Maysonet and Plaintiff had implicated him in the Wiley Murders. Cruz denied having anything to do with the crimes.

128. Defendants told Cruz he needed to sign a statement confessing to his involvement.

129. Defendant Guevara repeatedly physically abused Cruz and threatened to arrest members of his family.

130. At some point, Defendants presented Cruz with a prewritten statement and told him to sign it.

131. At the time, Cruz could not read.

132.    Because of the repeated abuse he had suffered, Cruz agreed to sign a statement.

## Additional Steps to Frame Plaintiff

133.    Independent of the serious misconduct that led Plaintiff to falsely implicate himself in the Wiley Murders, the Police Officer Defendants repeatedly and deliberately withheld evidence that further demonstrated Plaintiff's innocence. In addition, the Police Officer Defendants manufactured false evidence in an effort to frame Plaintiff for murder, while concealing the fact that their manufactured evidence was false.

134.    The Police Officer Defendants improperly coerced, encouraged, and manipulated other witnesses to falsely implicate Plaintiff in the crime, without disclosing their actions to procure this false testimony.

135.    Moreover, the Police Officer Defendants destroyed exculpatory evidence that could have been used to demonstrate Plaintiff's innocence. Defendants conspired with one another and with others currently unknown to Plaintiff in committing these acts, and in reaching agreements to fabricate, manufacture, suppress, and destroy evidence and to secure the wrongful conviction of Plaintiff by other unlawful means. The Police Officer Defendants continued this misconduct throughout Plaintiff's prosecution and wrongful incarceration, and it persists to the present day.

136.    The Police Officer Defendants planned, coordinated and conspired to obtain the coerced statements of Plaintiff, Maysonet, and Cruz, as well as others, using physically and psychologically abusive tactics as discussed above.

137.    The Prosecutor Defendants were present at the Area Five during the interrogations of these other suspects too, and participated personally in the interrogations and the drafting of the false statements incriminating Plaintiff and others.

138.    The Police Officer Defendants also procured an additional false statement from Rosa Bello, which was used to implicate Plaintiff in the Wiley Murders. The Police Officer Defendants concealed the improper conduct by which they secured this false identification.

139.    If Plaintiff had been given access to this information about the other suspects and witnesses, it would have been powerful evidence of his innocence and critical evidence by which he could have impeached both the individuals who testified falsely against him and also the Police Officer Defendants who testified that the evidence they had gathered in their investigation pointed toward Plaintiff.

140.    After Plaintiff was forced to implicate himself in the Wiley Murders, the Police Officer Defendants produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file. These documents, which were evidence used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that the Police Officer Defendants knew to be false. The Police Officer Defendants signed

these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was entirely false.

141.    Supervisors of the Police Officer Defendants were aware of their misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored the Police Officer Defendants' misconduct and decided to make Plaintiff liable for crimes he did not commit, rather than directing the officers to find the person who had actually committed the crimes. In addition, the supervisors of the Police Officer Defendants explicitly authorized their investigative conduct.

142.    The misconduct of the Police Officer Defendants and their supervisors deprived Plaintiff of evidence that would have established further that he had no connection to the Wiley Murders.

## Evidence of Plaintiff's Innocence Ignored

143.    In the midst of the misconduct described in this Complaint, the Defendants, individually, jointly, and/or in conspiracy, willfully ignored and acted to undermine evidence that showed conclusively that Plaintiff had nothing to do with the tragic murder of the Wiley brothers.

144.    Defendants disregarded the fact that no physical evidence from the scene of the crimes connected Plaintiff to the crime.

145.    In addition, none of the evidence that Defendants developed once Plaintiff became a suspect provided a connection between Plaintiff and the crime.

For example, Defendants disregarded Plaintiff's alibi and threatened to undermine it by involving his domestic partner in the crimes.

146. Plaintiff's statement also contained obviously false information and was yet further indication that Defendants' physically and psychologically abusive tactics had produced a false confession.

### Plaintiff's Wrongful Conviction and Imprisonment

147. As a result of Defendants' misconduct, Plaintiff was tried in the Circuit Court of Cook County.

148. Plaintiff's criminal trial began in March of 1992.

149. There was no physical evidence of any kind linking Plaintiff to the crime.

150. In exchange for recommending a reduced sentence to the court, Justino Cruz agreed with Cook County State's Attorney's Office to testify against Plaintiff, consistent with the coerced false statement he made to Defendants.

151. Cruz provided false testimony repeating the same story he told in his statement to the States Attorneys.

152. Without the fabricated evidence created by the Police Officer Defendants and Prosecutor Defendants, Plaintiff would never have been convicted.

153. A judge found Plaintiff guilty of first-degree murder. He was sentenced to life in prison.

154. Plaintiff was 32 years old at the time of his arrest. The following decades of his life were consumed by the horror of his wrongful imprisonment.

155.    Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. He lost decades of time where he was not with his partner, and he missed out on the opportunity to raise his children. Plaintiff's relationships with his domestic partner, children, and the rest of his family were extraordinarily harmed.

156.    Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

157.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

158.    Plaintiff spent decades in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

159.    Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

160.    In January 2018, Plaintiff filed a Post-Conviction Petition for Relief from Judgment. The State withdrew its opposition to Plaintiff's petition in August 2022.

161.    In August 2022, Judge Atcherson of the Cook County Circuit Court vacated Plaintiff's conviction. The State entered a motion of *nolle prosequi* on the counts against Plaintiff and dismissed all charges against him.

162.    At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half his life.

**Chicago's Policy and Practice of Wrongly Convicting
Innocent Persons in Violation of the Constitution**

163.    The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

164.    Since 1986, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

165.    These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including concealing exculpatory evidence, coercing confessions through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest,

prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

166. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

167. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

168. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

169. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of*

*Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

170.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Wiley Murders and investigation at issue here.

171.    In addition, a set of clandestine files related to Area Five homicides— the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

172.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation into the Wiley Murders.

173.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

174.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives

27

recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

175. Prior to and during the period in which Plaintiff was falsely charged with and convicted of the Wiley Murders, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

176. For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

177. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police

28

facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

178.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

179.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by Charlie Beck, the interim superintendent of the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

180.    As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with

29

serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

181.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identification as well as fabricating and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and other Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

182.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful charging and conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

30

a.  The conduct of live lineup, photographic, and other identification procedures.

b.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.  The risks of engaging in tunnel vision during investigation.

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

183.   The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

184.   The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case.

Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

185.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

186.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

187.    As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

188.    As of the filing of this complaint, 36 men and women have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men and women served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the 35 others are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron,

Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Gabriel Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Colon, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, and Edwin Davila.

189. Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

190. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

191. Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. These allegations include the

manipulation of dozens of witnesses to provide false identifications, as well as every single instance of misconduct detailed below.

192. A few examples of Defendant Guevara's misconduct include:

a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

34

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f. In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Defendant Ed Mingey.

i. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if

36

Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.   In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m.   In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the

murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q.  In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the

Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r.  In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s.  In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t.  In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

u.  In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v.  In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

w.  In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y.   In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z.   In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his

claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After

an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.   In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee.   In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.   In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to

43

release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg.   In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh.   In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii.   In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj.  In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk.  In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder.  Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll.  In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open

45

palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo.   In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp.   In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.   In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr.   In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss.   In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to

47

the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt.    In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu.    In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv.    In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness

identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

193. Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

194. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

195. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

196. As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

197. In the manner described more fully above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

198. Defendants knew this evidence was false.

199. Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

200.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

201.    In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

202.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

203.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

204.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

205.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
## 42 U.S.C. § 1983 – Coerced and False Confession
## (Fifth and Fourteenth Amendments)

206.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

207.    In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

208.    In addition, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

209.     In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

210.     Specifically, Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murders of the Wiley brothers.

211.     Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Wiley Murders.

212.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

213.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

214. The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT III
## 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
## (Fourth and Fourteenth Amendments)

215. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

216. In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

217. In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

218.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

219.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

220.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
## 42 U.S.C. § 1983 – Failure to Intervene

221.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

222.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants and the Prosecutor Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

223.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

224.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

225.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

226.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
## 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

227.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

228.    In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Wiley Murders, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

229.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

230.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

231. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

232. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

233. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI
## 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

234. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

235. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

236. At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and

questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

237.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

238.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

239.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal

suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

240.   In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal

conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

241. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

242. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

243. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

244. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of

Chicago or were actually committed by persons with such final policymaking authority.

245.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
## State Law Claim – Malicious Prosecution

246.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

247.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

248.    In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

249.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in August 2022.

250.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

251.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

252.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

253.    The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

254.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Willful and Wanton Conduct

255.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

256.    At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendants had a duty to refrain from willful and wanton conduct in connection with the Wiley Murders investigation.

257.    Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

258.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Civil Conspiracy

259.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

260.    As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators

agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

261.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

262.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

263.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

264.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
## State Law Claim – *Respondeat Superior*

265.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

266.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

267.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
## State Law Claim - Indemnification

268.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

269.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

270.    The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

271.    Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

272.    The Prosecutor Defendants were employees, members, and agents of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

273.    Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendants.


WHEREFORE, Plaintiff ALFREDO GONZALEZ, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, JOANN HALVORSEN as PERSONAL REPRESENTATIVE of the ESTATE OF ERNEST HALVORSEN, EDWARD MINGEY, STEVE GAWRYS, LEE EPPLEN, FERNANDO MONTILLA, ROLAND PAULNITSKY, RICHARD SCHAK,

ROBERT SMITKA, the CITY OF CHICAGO, JENNIFER BOROWITZ, FRANK DiFRANCO, JOHN PERKAUS, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ALFREDO GONZALEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**ALFREDO GONZALEZ**

BY:     s/ Sean Starr

*One of Plaintiff's Attorneys*